OPINION OF THE COURT
Fernando Tapia, J.
This is a CPLR article 78 proceeding which involves a residential developer, the New York City Board of Standards and Appeals (BSA), and the New York City Department of Buildings (DOB).
Petitioner Mr. James Woods, through counsel, filed an order to show cause (OSC) which seeks to vacate and modify the final determination of the BSA regarding a variance.
On or about July 13, 2010, the BSA found that a DOB-issued “Stop Work Order” on petitioner’s two-family dwelling construction was valid, and therefore denied petitioner’s application for a variance[1] to restore the building permits which would allow petitioner to complete construction.
*634 After review of the OSC and opposition papers, and after a good faith hearing between petitioner and the DOB, this court hereby decides the following:
Petitioner’s OSC is denied.
Did petitioner rely in good faith on the DOB-approved permits and plans, despite the DOB’s adoption of several interpretations of NY City Zoning Resolution § 23-49?* [2] Was there substantial evidence to support the BSA’s findings that petitioner failed to comply with section 23-49? These are the issues at fore.
I. Factual Background
On or about October 24, 2003, petitioner filed an application with the DOB to construct a two-family dwelling house at 4368 Furman Avenue, Bronx, New York 10466, which was approved on or about December 12, 2003. (See administrative record at 1, 20; see also Aug. 3, 2011 petitioner’s exhibit 3.)[3]
Construction on the subject building[4] began shortly after February 20, 2004, when the DOB issued permits. (Id.; see also Aug. 3, 2011 petitioner’s exhibit 2.) In May 2005, the DOB issued a stop work order of the construction, based on a lodged complaint by a neighbor. (See Aug. 26, 2011 petitioner’s exhibits 3, 6; see also Aug. 5, 2011 respondents’ exhibit E.)
Upon an audit performed by the DOB, it found that petitioner was noncompliant with an eight-foot side yard requirement along its northern lot line, pursuant to NY City Zoning Resolution § 23-49, which also includes exceptions to such require *635 ment.[5] (See Rl.) Petitioner did, however, comply with the side yard requirement along its southern lot line.
On or about December 11, 2006, petitioner filed for administrative appeal with the BSA.[6] He requested that the BSA clarify the correct interpretation of NY City Zoning Resolution § 23-49 regarding whether the subject building qualified for the exception of the eight-foot side yard requirement. (Id. at R7.)
On or about October 17, 2007, the BSA denied Mr. Woods’s application. (Id. at R3.) The BSA, however, advised him about applying for alternate relief pursuant to the variance provisions of NY City Zoning Resolution § 23-49. (See petitioner’s aff 1Í1Í17-18.)
Thus, on or about December 10, 2008, petitioner filed his application with the BSA to seek a variance to restore the DOB permits so that construction on the subject building can be completed.[7] (Id. 1i 23.) Multiple hearings on the variance were held. (Id. U 28; see also Jan. 21, 2011 administrative record.)
On or about July 13, 2010, the BSA denied petitioner’s variance application. (Id. 1Í 29.) Petitioner, through counsel, then filed an OSC on or about August 16, 2010, to vacate and modify the final BSA determination. Good faith hearings between petitioner and the DOB occurred before this court on August 3, 5, and 26, 2011.
Petitioner currently lives in Westchester County.
II. Article 78 and the “Substantial Evidence” Standard
A determination must be final before it can be reviewed. (See CPLR 7801.) Furthermore, under CPLR 7803 (4) (“Questions raised”), the standard of review in a certiorari proceeding is “substantial evidence.”[8]
“Substantial evidence” has been defined as “such relevant evidence as a reasonable mind might accept as adequate to sup *636 port a conclusion.” (Matter of Thomas v Codd, 51 AD2d 418, 420 [1st Dept 1976]; Matter of Sowa v Looney, 23 NY2d 329, 336 [1968].)
Under the substantial evidence test, the courts ought to refrain from reviewing the facts as to weight or evidence because that would usurp the function of the administrative agency beyond seeing that there is “substantial evidence.” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; see also Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7803:3 [2008].) Additionally, an administrative agency’s statutory interpretation which it is charged with administrating will be upheld if it is not irrational or unreasonable. (Matter of Howard v Wyman, 28 NY2d 434, 438 [1971].)
The function of judicial review with respect to article 78 proceedings is not to weigh the facts and merits and substitute the court’s judgment for that of the administrative agency’s, but rather to decide if it can be supported on any reasonable basis. (Matter of Clancy-Cullen Stor. Co. v Board of Elections of City of N.Y., 98 AD2d 635, 636 [1st Dept 1983].)
While a reviewing court should not accept or confirm a determination merely because it was made by an administrative officer, a court should set aside a determination of an administrative agency when there is no substantial evidence to sustain the administrative conclusion. (Matter of Thomas v Codd, 51 AD2d 418, 419-420 [1st Dept 1976].)
Here, the administrative agencies involved are the DOB and BSA, both agencies which have held comprehensive, thorough hearings on the proper and correct interpretation of NY City Zoning Resolution § 23-49 and its applicability to the subject building.
Not only did the DOB make appropriate considerations of all the relevant factors, but in so doing, the DOB found that the neighbors’ concerns outweighed that of petitioner’s. In addition, because petitioner failed to show substantial evidence of how the DOB’s findings were ambiguous as well as arbitrary and capricious, the BSA’s decision not to grant petitioner’s variance was soundly justified.
*637 III. Petitioner’s Good Faith Reliance on the DOB’s Permits and Plans Does Not Dictate Modifying or Vacating Respondents’ Findings
A. The Variance Depends on Whether the BSA Made Five Specific Findings of Fact Pursuant to NY City Zoning Resolution § 72-21
The BSA serves as the final administrative authority to interpretations of the Zoning Resolutions and other statutes relating to the construction of buildings in New York City. (See NY City Charter § 666 [5], [6] [“Jurisdiction”].) The BSA thus has the power to determine and vary the application of the zoning resolution, with respect to variances. It consists of a planner, registered architect, and licensed professional engineer. (Id. § 659.) A developer/property owner therefore is required to submit plans to the DOB for approval in order to seek a variance from the BSA to use a property in a manner that does not comport with the NY City Zoning Resolution. (Id. § 666 [5].)
According to NY City Zoning Resolution § 72-21, to issue a variance, the BSA must satisfy a five-prong criteria:[9]
(1) because of “unique physical conditions” of the property, conforming uses would impose “practical difficulties or unnecessary hardship”;
(2) because of the unique physical conditions, a variance is “necessary to enable the owner to realize a reasonable return” from the zoned property;
(3) the proposed variance “will not alter the essential character of the neighborhood or district”;
(4) the owner did not create the practical difficulties or unnecessary hardship; and
(5) only the minimum variance necessary to afford relief is sought.
Thus, should an applicant for a variance not meet the five-prong test as determined by the BSA, the variance will not be granted.
*638 B. Relevant Findings from the BSA’s Previous Public Hearings
1. October 16, 2007 Finding by the BSA under Calendar No. 320-06-A
On or about December 11, 2006, petitioner made its application before the BSA to challenge the DOB’s interpretation of the 1986 Berger memo.[10]
At the various public hearings, petitioner made the following claims: construction would require the demolition of eight feet of the width of the subject building. (See Rl.)
Petitioner also claimed that a change in interpretation of NY City Zoning Resolution § 23-49 has created unique conditions specific to the subject building and that NY City Zoning Resolution § 23-49 does not provide specific guidance regarding when the side yard waiver applies, especially when it relied on the 1986 Berger interpretation of NY City Zoning Resolution § 23-49. (Id. at R8.) The Berger interpretation sparked discussion on the meaning of “depth of the building.” (Id. at RIO.)
On or about May 8, 2007, a public hearing was held as a result of petitioner’s December 11, 2006 application. (Id. at R7.) There were four follow-up hearings. (Id.) At those hearings, topics from the interpretation of NY City Zoning Resolution § 23-49 to the interpretation of the 1986 Berger memo were heavily discussed and debated. (Id. at R7-14.)
More specifically, the BSA agreed with the DOB’s interpretation of NY City Zoning Resolution § 23-49: that applying NY City Zoning Resolution § 23-49 is limited to cases where the depth of the portion of the lot line wall of the adjacent building is at least 50% of the entire depth of that adjacent building. (Id. at R2, 12.)
Thus, the BSA concluded that because less than 50% of the total depth of the existing building is located on the shared lot line, the subject building must provide a side yard with a width of at least eight feet at the northern lot line. (Id. at R14.)
Petitioner appealed the DOB’s finding that the subject building does not meet the criteria of the side yard exception. (Id. at R2.)
*639 2. July 13, 2010 Finding by the BSA under Calendar No. 302-08-BZ
At the recommendation of the BSA, petitioner sought a variance in which the initial public hearing occurred on or about December 15, 2009. Petitioner sought a variance to permit an existing semi-detached residential building, contrary to the eight-foot side yard regulation. {Id. at Rl.)
As in the previous hearings, there were four continued hearings. {Id.) There, the panel had thorough discussions on the interpretations of NY City Zoning Resolution § 23-49, along with a dissection of petitioner’s supporting case law. (Id. at R26.)
At these variance hearings, petitioner claimed that the architect followed established procedures for the approval of the building plans. (Id. at Rl.) Petitioner also claimed that the subject building was constructed so as to use the existing adjacent lot line wall in a manner consistent with its interpretation of NY City Zoning Resolution § 23-49, and thus was consistent with the exception to the side yard requirement of NY City Zoning Resolution § 23-462 (a). (Id. at R2.)
Although petitioner relied on the Berger interpretation, petitioner argued that NY City Zoning Resolution § 23-49 allows the waiver of the side yard requirement when a proposed lot line wall overlaps at least 50% of an existing lot line wall on an adjacent lot. (Id.) All parties agreed, however, that the subject building failed to meet the 50% overlap.
Nevertheless, petitioner invoked the good faith reliance principle to claim that it relied in good faith on the DOS’s approval of the side yard condition based on the Berger interpretation, despite a change in interpretation as memorialized in the July 9, 2007 DOB memo based on the April 28, 2005 Borough Commissioners’ technical meeting minutes.[11] (Id. at R4, 112.)
On or about July 13, 2010, the BSA found that petitioner could not have relied in good faith on the DOB’s approval based on its own interpretation of NY City Zoning Resolution § 23-49 because petitioner could not show with substantial evidence, (1) *640 which interpretation the DOB applied that would allow for a side yard exception, or (2) that it constructed the subject building pursuant to plans in compliance with its own interpretation when the survey clearly shows that the minimum 50% overlap of the existing wall was not met. (Id. at R5.)
Accordingly, based on the BSA’s unanimous finding, petitioner filed its OSC, claiming that the BSA’s finding should be modified because its good faith reliance on its own interpretation of NY City Zoning Resolution § 23-49 was well-founded and proper.
C. The Good Faith Reliance Principle Must be Sparingly Used
Did petitioner show good faith reliance on (1) the previously issued DOB permits and (2) approved DOB plans which eventually created a unique hardship on the part of petitioner, thereby preventing completion of the subject building? This court answers “no.”
Petitioner relies on Matter of Pantelidis v New York City Bd. of Stds. & Appeals in which the Court of Appeals concluded that the Appellate Division of the First Department had a good faith reliance hearing to determine if the developer could claim reliance instead of remanding it to the BSA. (Matter of Pantelidis v New York City Bd. of Stds. & Appeals, 10 NY3d 846 [2008].)
Although the Pantelidis’ holding is what petitioner anticipates to be its own end result, petitioner cannot completely embrace the Court of Appeals’ opinion and apply it to its case because in Pantelidis, high-level municipal officials were involved. (See R4.) Here, there was no high-level official, but rather, a DOB plan examiner, thereby distinguishing Pantelidis from the instant matter.
At the BSA hearing, petitioner was expected to explain the following: (1) whether there was any way of knowing that the permit was invalid because the noncompliance could not have been discovered at the time of the approval of the permits; (2) petitioner’s reasoning for its own interpretation of NY City Zoning Resolution § 23-49; and (3) petitioner’s basis for the reliance on the approval. (Id.)
To invoke the good faith reliance principle is to have the conviction that an applicant can meet the stringent criteria of proving that high municipal officials played an integral part in denying a variance. (Id.) Here, petitioner failed to present substantial evidence that a high-level official was involved, or that the subject building met the 50% overlap.
*641 More importantly, petitioner’s architect had the knowledge and expertise of knowing that the DOB-approved permits were based on incomplete architectural plans. Because petitioner gave insufficient explanations, the BSA denied its variance application.
Furthermore, this court agrees with respondents that the record has little evidence that the DOB specifically considered the nonconforming side yard on the plans despite petitioner’s argument that it was arbitrary and capricious for the BSA to find that petitioner’s reliance on the approval issued after the DOB’s review was not in good faith. (See respondents’ opposition papers at 9; see also petitioner’s aff 11 47; petitioner’s mem of law at 12; R8.)
Accordingly, this court held a hearing to determine whether petitioner reasonably relied in good faith on the DOB permits/ plans, supported by substantial evidence.
IV The August 2011 Good Faith Hearings Revealed That the Permits Were Erroneously Issued, thus Sustaining the BSA’s Decision
Local zoning boards have broad discretion in considering applications for variances and a zoning board’s findings should be sustained on judicial review if it has a rational basis and is supported by substantial evidence. (Kettaneh v Board of Stds. & Appeals of the City of N.Y., 85 AD3d 620, 622 [1st Dept 2011].)
A. The Testimony of Mr. Marshall Kaminer was Credible
At the good faith hearings, Mr. Marshall Kaminer testified on behalf of the DOB.[12] Not only did he address the stop work order and the procedures surrounding the procurement of permits, but he also testified to the complaints lodged by the neighbors, as well as reassessed the plans drafted by Mr. Gino O. Longo, a witness for petitioner, who was the registered architect of the subject building.
Although the actual plan examiner, Mr. Dellutri, was unavailable to testify, Mr. Kaminer’s credible testimony regarding the shortcomings and omissions of the submitted architectural plans for the subject building convinced this court that the permits were erroneously issued. He gave a rational explanation for the *642 delay in acting upon the complaint leading up to the stop work order.[13]
During the August 26, 2011 hearing, the issue surrounding the windows for the subject building was discussed. According to Mr. Kaminer, there was something wrong with the plans because they were devoid of any showing of windows on the neighboring building lot line wall. He explained that had the plans shown windows, that it would have signaled a “red flag” to the DOB warranting a further investigation by the DOB plan examiner before issuing any permits to begin construction.
B. The Testimony of Petitioner’s Architect, Mr. Gino O. Longo
Mr. Longo, petitioner’s architect, testified that both he and petitioner specifically requested a DOB plan examiner to review the plans, instead of relying on professional self-certification. (See petitioner’s aff H 25.) According to Mr. Longo’s testimony, his submitted plans were approved, thus indicating that construction could proceed. But what Mr. Longo did not point out was the fact that DOB plan examiners do not make site inspections. Instead, DOB plan examiners rely on the plans submitted by the architect as complete and accurate of the construction site. Thus, for all intents and purposes, the architectural plans submitted by Mr. Longo and its approval by the DOB plan examiner were tantamount to architect self-certification.
Although the DOB admits that it issued the plans/permits in error,[14] it did so as a result of having incomplete plans submitted by petitioner. In Mr. Longo’s submitted plans, the neighboring building’s lot line wall does not indicate the presence of any windows. This is especially troubling given the fact that petitioner’s new construction located at 4368 Furman Avenue, when completed, would in effect block out completely several windows on the neighboring building’s lot line wall.
The blocking of windows, according to Mr. Longo, generated complaints by residents in the neighboring building. The nature of these complaints were readily foreseeable upon a simple sight inspection by Mr. Longo. Yet Mr. Longo testified that he was not *643 required to indicate on his plans windows on the neighboring building’s lot line wall, even though some of these windows were completely blocked out by the new construction at 4368 Furman Avenue.
Mr. Longo also testified that the mere fact that the neighboring building’s lot line wall contained windows did not mean that they could not be blocked by new construction. He went on to testify that windows that merely provide “view” only, can be blocked. Mr. Kaminer agreed.
Both also testified, however, that windows that are the sole source for providing both light and ventilation in an apartment room cannot be blocked. To allow otherwise, both Mr. Longo and Mr. Kaminer agree, would render the affected apartment rooms uninhabitable because of the inadequate light and ventilation. This court inquired of both witnesses whether a determination was ever made as to the impact upon the affected apartments’ light and ventilation. Mr. Kaminer answered in the negative. Mr. Longo gave a more equivocal response, testifying that he relied solely on petitioner’s representation that there were no “easements” on record.
Based only on petitioner’s oral representation, Mr. Longo concluded that the blocked windows were illegal and hence, could be legally blocked. At the good faith hearing, the following transpired regarding the windows:[15]
“Q: Mr. Longo, prior to submitting the plans for this job, did you do any investigation with respect to the windows on the adjoining building?[16]
“A: We were aware that there were windows on the adjoining building. I merely asked my client if there were any ventilation on lot line easement, if anything like that came up in his title, and he said no, and that would generally mean that those windows that are on the lot line are not required windows and that the adjacent property owner just voluntarily put those windows on the lot line, which would mean that they were not required windows.
“the court: You were relying on this representation by Mr. Woods, right, that was the representation you were relying on?
“A: That’s correct.
“the court: Any particular reason why you didn’t *644 make reference to those windows in your plans?
“A: The building is on the lot line. When you are filing a plan with the DOB, your scope of work is limited to what goes on within your property line. If the neighbor had windows on the property line which were not legally there, that’s not an issue that I need to concern myself with.
“the court: Did you know for a fact that they were not legal at the time?
“A: I knew that there were no ventilation easements or any sort of restrictions against the property which would legally prevent us from closing the windows up.
“the court: Where did you get that information from?
“A: From Mr. Woods.
“Q: Did you see the easements?
“A: There are no easements.
“the court: Did you see any documentation that would indicate that to be the case, that there are no easements at that point?
“A: No.
“the court: Did you alert the DOB as to the fact that there were windows there, for clarification that, in fact, there wouldn’t be any issues down the road?
“A: No, I did not.”
Mr. Longo’s reliance upon petitioner’s “oral” representation is especially perplexing given the fact that petitioner admitted knowing nothing about zoning or building codes. In connection with petitioner’s attorney’s question:[17]
“Q: Now, do you have any particular knowledge of zoning or building code?
“A: Didn’t know anything about it. I just was leaving it all up to the architect or whatever.”
Mr. Longo, nevertheless, testified that the issue of blocked windows was not the issue before the BSA on appeal. But rather, whether petitioner should be granted a variance of the side yard requirement.
In fact, petitioner argues that the DOB’s active involvement with approving his plans confirms his reasonable reliance on the permits and reinforces his stance that his good faith reli *645 anee on the approved permits/plans led to unique conditions affecting the subject building. (See petitioner’s aff U1Í 52-53.)
Petitioner’s contention that the DOB’s issuance of the permits, even if mistaken, does not render the permits invalid, misses the point entirely, and that is that plans that are incomplete cannot be the basis for the issuance of valid permits, if what is omitted from the plans, constitutes a material factor in the DOB’s consideration process of whether or not to issue the permit.[18]
Therefore, it was petitioner who was in the best position to avoid the faulty issuance of the permits because petitioner omitted material information and specifications in its plans (lot line wall windows) of the subject building that the DOB otherwise would not have or does not have.
Mr. Kaminer set forth the DOB’s reasoning on why indication of windows in Mr. Longo’s plans were an essential factor in the completeness of those plans:[19]
“the court: And you are saying that the plan examiners ok was not—
“A: Well, based on the drawing that, number one, there were no windows shown.
“the court: No windows shown on the drawing?
“A: On the adjacent building, no.
“the court: Show me that. Do you have the plans there to show that? Let me see that.
“A: Yes. This is the only time the existing building shows, and there are no windows. There is nothing shown to indicate any windows, and the extent of the building is also not shown.
“the court: If there had been windows indicated—
“A: That might have raised a red flag for the examiner to verify what’s going on, to see if they could legitimately cover the windows or not, based on 23-49.”
V Conclusion
In sum, petitioner failed to meet its burden of proving good faith reliance on the DOB-issued permits. Because petitioner was in the best position to avoid the erroneous issuance of the *646 permits, it cannot now invoke the good faith reliance principle in its effort to have the BSA determination overturned as without a rational basis or as arbitrary and capricious.
Accordingly, after weighing the testimonies of Mr. Kaminer and Mr. Longo, coupled with respondents’ thorough and comprehensive public hearings, this court finds that the DOB permits were issued on an incomplete set of plans submitted before the DOB. The BSA’s July 13, 2010 finding is therefore proper.
Wherefore petitioner’s OSC is denied.

. The “variance” refers to an eight-foot side yard requirement as set forth in NY City Zoning Resolution § 23-49. Petitioner seeks a variance of the side yard requirement based on the practical difficulty and unnecessary hardship as a result of relying in good faith on DOB’s approval of its plans and issuance of building permits under which it completed construction of the build *634 ing, absent the required eight-foot side yard allowance along its northern lot line. (See administrative record at 1.)

. Under NY City Zoning Resolution § 23-49 (2011) (“Special Provisions for Side Lot Line Walls”),
“[a] building containing residences may:
“(a) abut an existing building located along a side lot line . . . provided that walls of the building containing residences and walls of the existing building shall abut for a length equal to or greater than one half of the distance between the street wall line and rear wall line of the existing building.”

. The administrative record from previous administrative DOB/BSA hearings has been Bates-stamped. It was submitted before the court on or about January 21, 2011. Page references will be designated by “R” following the Bates numbering.

. The subject building is located within an “R5” zoning district. (See R17.)

. A “side yard” ensures enough light and air between buildings. (See petitioner’s mem of law at 3.) Under NY City Zoning Resolution § 23-49 (2011),
“[t]he side yard requirements shall be waived along the side lot line of the zoning lot coincident with the abutting buildings, and one side yard shall be provided along any side lot line of the zoning lot without an abutting building with a width of at least eight feet.”

. This was under calendar No. 320-06-A. (See R7.)

. This was under calendar No. 302-08-BZ.

. Under CPLR 7803 (4) (“Questions raised”), “whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant *636 to direction by law is, on the entire record, supported by substantial evidence.”

. Kettaneh v Board of Stds. & Appeals of the City of N.Y., 85 AD3d 620, 621 (1st Dept 2011).

. George Berger was the former Building Department Commissioner. Based on the Berger memo of 1986 “[t]he special provisions of ZR § 23-49 (a) and (c) are applicable when the party walls are utilized or shared for 50% or more of the depth of the building.” This was the contested memo between the parties regarding the proper interpretation.

. On April 28, 2005, the DOB Borough Commissioners’ technical meeting reinterpreted NY City Zoning Resolution § 23-49, stating that “[w]here the party or side lot line wall of the existing building is less than 50% of the total depth of the existing building, ZR § 23-49 cannot be applied, and the side yard requirement cannot be waived.” These notes were reduced to writing and distributed to DOB staff on July 9, 2007. (See R10.)

. Mr. Kaminer was the DOB Bronx Borough Commissioner during the subject time frame.

. This type of complaint, “blocking windows,” is a “B” violation which does not take priority over “A” violations (imminent threat of danger collapsing wall). According to Mr. Kaminer, the DOB has a serious backlog of “B” violations, the sheer number of which creates significant delays in addressing these types of complaints.

. See respondents’ opposition papers at 11, 13.

. See good faith hearing transcript at 69-70.

. Question by petitioner’s attorney, Mr. Simon Rothkrug.

. See good faith hearing transcript at 38.

. Mr. Longo in his testimony conceded that DOB plan examiner Mr. Dellutri made a “severe” mistake in approving petitioner’s plan.

. See Aug. 26, 2011 good faith hearing transcript at 53-55.